Stanley ORZEL, Plaintiff-Appellee,

v.

CITY OF WAUWATOSA FIRE DE-
PARTMENT, Defendant-Appellant.

No. 81-2564.

United States Court of Appeals,
Seventh Circuit.

Argued March 29, 1982.

Decided Jan. 3, 1983.

Rehearing Denied May 12, 1983.

David Leo Uelmen, Goldberg, Previant, Uelmen, Gratz, Miller, Levy & Brueggeman, S.C., Milwaukee, Wis., for defendant-appellant.

John K. Brendel, Brendel, Flanagan, Sendik & Fahl, Wauwatosa, Wis., for plaintiff-appellee.

Before CUMMINGS,* Chief Judge, and PELL, and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

The City of Wauwatosa, Wisconsin, appeals from the decision and order of a United States Magistrate finding the City liable, under the Age Discrimination in Employment Act (the "ADEA" or the "Act"), 29 U.S.C. §§ 621 *et seq.* (1976 & 1978 Supp.), for illegally terminating the employment of its Assistant Fire Chief, Stanley Orzel, upon Orzel's attainment of the City's then-mandatory retirement age of 55. The City also challenges the magistrate's finding of a "willful" violation of the ADEA and his consequent award of liquidated damages under 29 U.S.C. § 626(b). We affirm.

---

* Chief Judge Walter J. Cummings took the place of Judge Robert A. Sprecher, who was originally assigned to this case but, because of failing health, was unable to participate in the decision. Judge Sprecher died May 15, 1982.

## I

Plaintiff, Stanley Orzel, is currently a 59-year-old resident of Wauwatosa, Wisconsin.[1] In 1949, Orzel was hired as a firefighter by the Wauwatosa Fire Department; thereafter he was promoted through the ranks until reaching the position of Assistant Chief, a position he held from 1970 until his compulsory retirement in 1978. In May 1977, the City informed Orzel that he would be forced to retire from his position as Assistant Chief on December 31, 1978, pursuant to the City's then-existing compulsory retirement age of 55 for all "protective service" employees.[2] Orzel's request to the City's employee relations committee for an extension of employment was denied, and Orzel was, in fact, mandatorily retired on December 31, 1978.

After unsuccessfully pursuing his administrative remedies, as required by section 626 of the ADEA, Orzel filed the instant lawsuit in federal district court. In his Complaint, Orzel sought reinstatement as well as compensatory and liquidated damages under section 626(b) of the ADEA.[3] In its Answer and supporting papers, the City admitted that Orzel had been forced to retire at age 55, but claimed that this compulsory retirement did not violate the ADEA because age was a bona fide occupa-

tional qualification for the job of firefighter and because the ADEA could not constitutionally be applied to state and local governments.[4]

On May 6, 1980, the district court, pursuant to stipulation, ordered the case transferred to United States Magistrate Aaron E. Goodstein. A trial was held before Magistrate Goodstein on February 11–13, 1981. Prior to trial, the parties stipulated that the plaintiff, Stanley Orzel, was "physically and mentally in excellent condition and good health and that no claim is made that he personally was not capable of performing all fire department functions."

On August 31, 1981, Magistrate Goodstein issued a Decision and Order sustaining Orzel's claim of age discrimination and awarding Orzel both actual and liquidated damages. The magistrate, however, deducted from his damage award all amounts "received by the plaintiff from unemployment compensation benefits and retirement pension benefits," Decision and Order at 18, as well as "the amount of [plaintiff's] interim earnings." *Id.,* at 19. The magistrate also concluded, in the face of conflicting lower court authority, that damages for pain and suffering were not available under the ADEA and, hence, refused to include any such damages in his award.[5] In awarding

---

1. Orzel was born October 24, 1923.

2. "Protective service" employees are described and defined in Wis.Stat.Ann. §§ 41.02(11)(a) (1979), and include firefighters of all ranks. *See* Appellant's Br. at 7; Pl.Ex. 5.

3. 29 U.S.C. § 626(b) (1976), which governs the award of damages to successful ADEA plaintiffs, provides:

    Amounts owing to a person as a result of a violation of this chapter shall be deemed to be unpaid minimum wages or unpaid overtime compensation for purposes of sections 216 and 217 of this title: *Provided,* That liquidated damages shall be payable only in cases of willful violations of this chapter.

4. After the appellate briefs in this case had been filed, this court in *EEOC v. Elrod,* 674 F.2d 601 (7th Cir.1982), sustained the constitutionality of Congress' 1974 extension of the ADEA to state and local government employers. *See also EEOC v. County of Calumet,* 686 F.2d 1249, 1251–53 (7th Cir.1982) (application of ADEA to state and local governments consti-

tutes proper exercise of Congress' power under § 5 of the Fourteenth Amendment). The constitutional issue raised by the City has, therefore, been conclusively resolved in this circuit and will not be addressed here.

5. At the time the magistrate issued his decision, this court had not yet addressed the question whether damages based on pain and suffering were compensable under the ADEA, and district courts within this circuit had reached conflicting results on the issue. *Compare, e.g., Morton v. Sheboygan Memorial Hospital,* 458 F.Supp. 804, 807 (E.D.Wis.1978) *and Buchholz v. Symons Mfg. Co.,* 445 F.Supp. 706, 713 (E.D. Wis.1978) (damages for pain and suffering appropriate form of relief under ADEA) *with Jaeger v. American Cyanamid Co.,* 442 F.Supp. 1270, 1272–73 (E.D.Wis.1978) (compensatory damages for pain and suffering not available under ADEA).

    Recently, in *Pfeiffer v. Essex Wire Corp.,* 682 F.2d 684 (7th Cir.1982), this court held that neither punitive damages nor damages for pain and suffering are available under the ADEA.

liquidated (or double) damages under section 626(b) of the Act, the magistrate noted that the statute provided for liquidated damages "only in cases of willful violations of this Act." Decision and Order at 21. After reviewing in some detail the development and chronology of Orzel's age discrimination claim, the magistrate found that the violation by the City could not be characterized as "accidental or unintentional," and that the City satisfied the standard for willfulness set forth in *Wehr v. Burroughs Corp.*, 619 F.2d 276, 280 (3d Cir.1980).

In sustaining plaintiff's charge of discrimination, the magistrate also rejected the City's argument that age 55 constitutes a bona fide occupational qualification ("BFOQ"), under section 623(f)(1) of the ADEA, for the job of firefighter in Wauwatosa, Wisconsin.[6] The magistrate concluded that, although the evidence presented by both sides indicated that *some* age below the federally protected limit of 70 could qualify as a BFOQ, the City had failed to establish either that a mandatory retirement age of 55 was reasonably necessary to the efficient operation of its fire department, or that substantially all persons over 55 would be unable to perform firefighting duties:

> It is the opinion of this court that the Wisconsin legislative history is not sufficient to satisfy defendant's burden that age 55 is a BFOQ. There is a lack of evidence to convince this court that the selection of age 55 represented the appropriate balancing test that the policy underlying the ADEA requires. *There is not a scintilla of evidence to relate age 55, as opposed to ages 50 or 60, to the public interest and safety.*

Magistrate's Decision and Order at 14 (emphasis supplied).

On appeal, the City challenges the magistrate's conclusion that age 55 is not a valid BFOQ for the job of firefighter. Citing this court's decision in *EEOC v. Janesville*, 630 F.2d 1254 (7th Cir.1980), the City argues that "once it is conceded that an age less than 70 is a BFOQ, the judgment made by the appropriate local officials should be approved." Appellant's Br. at 22. The City also argues that its selection of age 55 is supported by (1) federal and state legislative history; (2) findings made and reported in other judicial decisions; and (3) the medical and other evidence submitted in this case. *Id.*

On the question of damages, the City urges that because the legal issues surrounding the application of the ADEA to the compulsory retirement of municipal firefighters "were at no time clear and unambiguous," and because "[t]he City had and still has a legally justifiable basis for contesting plaintiff's claim," the magistrate erred in finding a willful violation of the Act and in awarding double damages pursuant to 29 U.S.C. § 626(b) (1976). The City also argues that the magistrate's award of actual damages should be significantly reduced because the plaintiff violated his duty to mitigate and that, in any event, the plaintiff should not be compensated for any damages incurred subsequent to December 21, 1979, when he rejected an offer by the City to return to work.[7] We shall first address the BFOQ issues before turning to the question of damages.[8]

## II

The ADEA, originally enacted in 1967, makes it unlawful for any employer, em-

6. 29 U.S.C. § 623(f)(1) provides, in pertinent part, that it shall not be unlawful for an employer
   (1) to take any action otherwise prohibited ... where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business ....

7. This offer of reinstatement by the City, which was expressly conditioned upon Orzel's taking and passing a physical exam, is discussed further at p. 757 *infra*.

8. Defendant also argues, most strenuously in its Reply Brief, that Orzel did not timely file his discrimination charge with the appropriate federal and state agencies and, thus, that the statute of limitations bars this action. The City, however, did not raise this defense in its Answer or in any other pleading; the defense has, therefore, been waived. *Wagner v. Fawcett Publications*, 307 F.2d 409, 412 (7th Cir.1962).

ployment agency or labor organization to discriminate on the basis of age against persons between the ages of 40 and 70.[9] Congress' goals in passing the ADEA were threefold: to promote the employment of older workers based on ability rather than age; to prohibit arbitrary age discrimination in employment; and to aid employers and workers in studying the relationship between age and employment. 29 U.S.C. § 621(b) (1976); *EEOC v. Elrod,* 674 F.2d 601, 604 (7th Cir.1982). Although the ADEA generally prohibits employers from relying solely upon age as a measure of individual ability, the Act contains several exceptions which allow the use of age as an employment criterion in certain, limited, situations. The most important of these exceptions—the BFOQ exception—allows an employer to discriminate, on the basis of age, against members of the statutorily protected class if "age is a bona fide occupational qualification *reasonably necessary to the normal operation of the particular business."* 29 U.S.C. § 623(f)(1) (1976) (emphasis supplied).

▪ Because the BFOQ exception frees an employer from the ADEA's general requirement of making individualized judgments regarding the ability of older workers, overuse of the exception involves the risk of reintroducing on a broad scale the very age stereotyping the ADEA was designed to prevent. For this reason, and because of the general maxim that exceptions to a remedial statute are to be "narrowly and strictly construed," *Sexton v. Beatrice Foods Co.,* 630 F.2d 478, 486 (7th Cir.1980), the courts have consistently held that the BFOQ exception to the ADEA is to be interpreted narrowly, and that the burden is on the employer to demonstrate its applicability. *See, e.g., EEOC v. Janesville,* 630 F.2d 1254, 1258 (7th Cir.1980); *Smallwood v. United Air Lines, Inc.,* 661 F.2d 303, 307 (4th Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2299, 73 L.Ed.2d 1302 (1982); *Houghton v. McDonnell Douglas Corp.,* 553 F.2d 561 (8th Cir.), *cert. denied,* 434 U.S. 966, 98 S.Ct. 506, 54 L.Ed.2d 451 (1977); *cf. Dothard v. Rawlinson,* 433 U.S. 321, 324, 97 S.Ct. 2720, 2724, 53 L.Ed.2d 786 (1977) (BFOQ exception to Title VII was meant to be an "extremely narrow exception"). Moreover, both the Department of Labor, the federal agency originally entrusted with the enforcement of the ADEA, and the Equal Employment Opportunity Commission, to whom enforcement responsibilities were transferred in 1979, have consistently advocated an extremely narrow interpretation of the BFOQ defense.[10] Such an interpretation by the agencies charged with enforcement of the ADEA is, of course, entitled to considerable weight. *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

With these general considerations in mind, we turn to an examination of the particular BFOQ defense asserted by the City in the instant case. In contending that age 55 constitutes a valid BFOQ for local firefighters, the City raises essentially three arguments. First, the City notes, correctly, that federal firefighters are ordinarily re-

9. As originally enacted, the ADEA applied only to persons between the ages of 40 and 65. In 1978, however, Congress raised the upper age limit to 70 years of age. Age Discrimination in Employment Act Amendments of 1978, Pub.L. No. 95–256, § 3(a), 92 Stat. 189 (codified at 29 U.S.C. § 631 (1980 Supp. I)).

10. In 1968, the Department of Labor issued an Interpretive Bulletin designed to assist employers in understanding and complying with the ADEA. This Bulletin anticipated that the "concept of a bona fide occupational qualification will have limited scope and application," and stated that "the burden of proof in establishing that [the exception] applies is the responsibility of the employer.... [who] relies on it." 29 C.F.R. 860.102(b) (1981) (superseded, September 21, 1981). The Bulletin further noted that "[w]hether occupational qualifications will be deemed 'bona fide' and 'reasonably necessary to the particular business,' will be determined on the basis of all the pertinent facts surrounding each particular situation." *Id.*

These statements were repeated, in substantially unchanged form, in the final ADEA Interpretive Regulations issued by the EEOC on September 21, 1981. *See* 46 Fed.Reg. 47724, 47727 (1981) (to be codified at 29 C.F.R. § 1625 *et seq.*).

quired by statute to retire at age 55.[11] Observing that the relevant federal retirement statute was passed by the same Congress that extended the proscriptions of the ADEA to state and local governments, the City argues that Congress could not possibly have intended to prohibit state and municipal employers from adopting age 55 as a mandatory retirement age for local firefighters while, at the same time, authorizing compulsory retirement of federal firefighters at that same age. We find this argument unpersuasive for several reasons.

Initially, we note that the federal retirement statute contains an express provision allowing the head of the appropriate federal agency, "when in his judgment the public interest so requires, [to] exempt [a federal firefighter] from automatic separation under this subsection until that employee becomes 60 years of age." 5 U.S.C. § 8335(b) (1976). Thus, unlike the compulsory retirement scheme in place in Wauwatosa at the time of Orzel's termination, the federal retirement scheme expressly allows for individualized determinations of fitness in exceptional cases.[12]

More important, the fact that Congress has determined that age 55 is an appropriate retirement age for one group of firefighters does not automatically establish that the same retirement age is a valid BFOQ, under section 623(f) of the ADEA, for a wholly different group of employees, operating under different working conditions and performing significantly different job functions. See Tuohy v. Ford Motor Co., 675 F.2d 842 (6th Cir.1982) (existence of FAA "Age 60 Rule" for commercial airline pilots does not establish, as valid BFOQ, same retirement age for non-commercial pi-

lots). Nothing in the record here indicates that the tasks performed by local firefighters in Wauwatosa, Wisconsin are substantially identical to those carried out by federal firefighting personnel; indeed, the City, in its appellate brief, seems to suggest the opposite.[13] Moreover, as a legal matter, mandatory retirement schemes approved by Congress for federal employees are not subject to the strict requirements of the ADEA, *Stewart v. Smith,* 673 F.2d 485 (D.C.Cir.1982); rather, such schemes need only be rationally related to a permissible government objective. *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979). Only those age limitations that are so unreasonable as to constitute an arbitrary and capricious exercise of legislative power will fail this test. *Id.; see Starr v. Federal Aviation Administration,* 589 F.2d 307 (7th Cir.1978) (upholding, under abuse of discretion standard, FAA rule prohibiting persons over age 60 from serving as commercial airline pilots; distinguishing between this standard and BFOQ analysis necessary to sustain age qualification against challenge brought pursuant to ADEA). Under the ADEA, by contrast, compulsory retirement schemes must not only be arguably rational; they must also be *reasonably necessary* to the operation of the particular business in question. 29 U.S.C. § 623(f)(1) (1976); *Harriss v. Pan American World Airways,* 649 F.2d 670, 677 (9th Cir.1980) (district court applied erroneous BFOQ standard in requiring only that challenged policy be "reasonable" in light of safety factors rather than "reasonably necessary" to the efficient operation of the employer's business). Thus, an employer seeking to justify its mandatory retirement

11. 5 U.S.C. § 8335(b) (1976) provides that a federal firefighter or law enforcement officer who is otherwise eligible for immediate retirement "shall be separated from the service on the last day of the month in which he becomes 55 years of age or completes 20 years of service if then over that age."

12. The City of Wauwatosa's compulsory retirement ordinance did allow the city council to grant extensions of employment for up to five years to those employees "who will not have

accumulated twenty-five years of creditable service under the Wisconsin Retirement Fund at the time they reach normal retirement date." Extensions based on individual fitness, however, were not permitted. *See* Pl.Exs. 6, 7.

13. At page 13 of its appellate brief, the City states that "in recent years there have been few fires in [Wauwatosa]" and that "[a]t the time of trial there had been no major fire in Wauwatosa in many years."

age as a valid BFOQ must satisfy a much more stringent evidentiary test than the mere rationality requirement imposed on federal retirement schemes. *Tuohy v. Ford Motor Co.,* 675 F.2d 842, 845–46 (6th Cir. 1982).

Also noteworthy in this regard is the fact that in April 1982, the Sixth Circuit reversed the district court decision upon which the City here principally relies to support its contention that the federal retirement statute establishes, as a matter of law, the "reasonable necessity" of the City's analogous retirement age. In *Tuohy v. Ford Motor Co.,* 490 F.Supp. 258 (E.D. Mich.1980), a district court had granted summary judgment in favor of an employer in an ADEA action on the ground that the employer's adoption, for its own pilot-employees, of the age 60 retirement rule promulgated by the FAA for commercial pilots was *per se* reasonable and, hence, qualified as a valid BFOQ for purposes of the ADEA. 490 F.Supp. at 264. The district court in *Tuohy* concluded that where safety is a paramount factor, as it is in the case of airline pilots, the ADEA required no more of an employer than that its rule be "reasonable"; it then held that a mandatory retirement age based upon the related determination of an "appropriate federal agency" necessarily satisfied that standard. *Id.* at 263–64.

The Sixth Circuit, in *Tuohy v. Ford Motor Co.,* 675 F.2d 842 (6th Cir.1982), reversed, holding that the existence in the record of conflicting evidence regarding "the ability of medical science to make determinations concerning a particular pilot's state of health independent of age," created a material issue of fact bearing upon the "reasonable necessity" of Ford's mandatory retirement policy. 675 F.2d at 845. In its opinion, the Sixth Circuit expressly rejected the district court's conclusion that the "Age 60 Rule" promulgated by the FAA pre-empted further inquiry into the "reasonable necessity" of Ford's analogous mandatory retirement scheme:

> The presence of an overriding safety factor might well lead a court to conclude

as a matter of policy that the level of proof required to establish the reasonable necessity of a BFOQ is relatively low. However, this is quite different from dispensing with the requirement of necessity and holding that a BFOQ has been established as a matter of law because adoption [by another body] of a rule based on age was reasonable.

675 F.2d at 845 (citations omitted).

We agree with the reasoning of the Sixth Circuit in *Tuohy* and, therefore, reject the City's contention that the presence of a statutorily mandated retirement age of 55 for federal firefighters automatically establishes the validity of the City's BFOQ defense. Rather, we hold that to avoid liability under the ADEA, the City must still demonstrate, by objective and credible evidence, that its compulsory retirement rule qualifies as a "bona fide occupational qualification reasonably necessary to the normal operation of the particular business" in question. 29 U.S.C. § 623(f)(1) (1976).

### III

The City next contends that in rejecting age 55 as a valid mandatory retirement age for local firefighters, the magistrate failed to give sufficient deference to the judgment of the Wisconsin state legislature and, further, applied an erroneous legal standard which has been rejected in previous Seventh Circuit age discrimination cases. We reject these contentions.

■ First, the Wisconsin Retirement Fund Act, Wis.Stat.Ann. ch. 41 (1979), upon which the City seeks to rely, does not mandate compulsory retirement of protective service employees at *any* age. Rather, the statute merely sets age 55 as a "normal retirement date" for purposes of determining pension eligibility. *See* Wis.Stat.Ann. § 41.02(23) (1979). Individual municipalities remain free to extend employment beyond that date for as long as they see fit. *Id.* Moreover, surveys conducted by the Wisconsin Retirement Research Board indicate that, as of 1972, only 1 of the 100 largest cities in the country required mandatory retirement of firefighters at age 55,

and that almost 50% of the cities surveyed used age 65 for this purpose. Tr. 307; Def.Ex. D at 10–11.[14] The reports of the Retirement Research Board further show that, as of 1973, the average compulsory retirement age for local Wisconsin firefighters was 63.6; perhaps even more significantly, they indicated that, historically, there has been little, if any, correlation between the "normal retirement date" defined in the state statute and the actual mandatory retirement ages set by individual Wisconsin municipalities for their "protective service" employees. Tr. 327; Def.Ex. E at 2–3. Indeed, the fact that the City of Wauwatosa was able, during the pendency of this litigation, to raise its compulsory retirement age for firefighters from 55 to 60 without any prior approval or objection from the state, severely undercuts the argument that the City considered itself bound by the state's suggested "normal retirement date." Thus, the City's attempt to invoke the judgment of the Wisconsin state legislature to support its BFOQ defense is not persuasive here.

Moreover, even if the state of Wisconsin had set age 55 as a mandatory retirement age for all firefighters within the state, we would be unable to accord that judgment the extreme deference urged by the City here. It is true that, as a general matter, state legislative judgments are entitled to considerable deference. *EEOC v. Janesville,* 630 F.2d 1254, 1259 (7th Cir.1980). We do not believe, however, nor do we read the *Janesville* decision as holding, that in situations where a state or local government's forced retirement of older employees is being challenged under the ADEA, state mandatory retirement schemes are automatically to be presumed valid. Such a presumption flies in the face of the 1978 ADEA Amendments, which explicitly abolished the exception previously read into the ADEA for compulsory retirement made pursuant to a bona fide retirement plan.[15] Moreover, as a practical matter, application of a statutory presumption of validity to a state mandatory retirement scheme would effectively shift to the employee challenging that scheme the burden of refuting his employer's BFOQ defense. *EEOC v. St. Paul,* 671 F.2d 1162, 1167 (8th Cir.1982). Such burden shifting, however, contravenes the settled law of both this and other circuits that it is the employer—not the employee—who has the burden of establishing a BFOQ defense. *See, e.g., EEOC v. Janesville, supra,* 630 F.2d at 1258;

14. Similar survey evidence was viewed as highly significant in *Johnson v. Baltimore,* 515 F.Supp. 1287 (D.Md.1981), *cert. denied,* 455 U.S. 944, 102 S.Ct. 1440, 71 L.Ed.2d 656 (1982), in which the court rejected a municipality's claim that mandatory retirement of firefighters at age 60 constituted a valid BFOQ:

> Defendants' selection of the arbitrary age of sixty for the mandatory retirement of Baltimore firefighters is particularly suspect in view of what other municipal fire departments have done. A survey of the mandatory retirement ages of fire department personnel in thirty of the largest cities in the United States indicates that only four cities have a mandatory retirement age of sixty. Twenty-two cities have a retirement age of sixty-five or older or have no mandatory retirement age at all for firefighters. Nothing in the record indicates that Baltimore Fire Department personnel perform duties any more arduous than those undertaken in other cities. To accept defendants' contention that substantially all firefighters above age sixty cannot safely and effectively perform their duties would indicate that a large number of fire departments across the country are inadequately or improperly manned.

515 F.Supp. at 1297 (footnote omitted).

15. With regard to this exception, the Conference Report accompanying the 1978 Amendments stated:

> The conferees agree that the purpose of the amendment to section 4(f)(2) is to make absolutely clear one of the original purposes of this provision, namely, that the exception does not authorize an employer to require or permit involuntary retirement of an employee within the protected age group on account of age.
>
> In *McMann v. United Airlines,* [434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402] (1977), the Supreme Court held to the contrary, reversing a decision reached by the Fourth Circuit Court of Appeals, 542 F.2d 217 (1976). The conferees specifically disagree with the Supreme Court's holding and reasoning in that case.

H.Conf.Rep. No. 950, 95th Cong., 2d Sess. 7, *reprinted in* 1978 U.S.Code Cong. & Ad.News, 504, 528, 529.

*Smallwood v. United Airlines, Inc.,* 661 F.2d 303, 307 (4th Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2299, 73 L.Ed.2d 1302 (1982); *Houghton v. McDonnell Douglas Corp.,* 553 F.2d 561, 564 (8th Cir.), *cert. denied,* 434 U.S. 966, 98 S.Ct. 506, 54 L.Ed.2d 451 (1977).

■ Application of a statutory presumption of validity would also put state and local governments in a much better position under the ADEA than private employers—a result which is contrary to the express intent of Congress in extending the ADEA's protections to state and local government employees.[16]   Moreover, cases which have discussed the BFOQ exception in the sex discrimination context have not suggested that government employers should be treated any differently under the Act than private employers. *See Dothard v. Rawlinson,* 433 U.S. 321, 333, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786 (1977); *id.* at 339, 97 S.Ct. at 2731 (Rehnquist, J., concurring); *EEOC v. St. Paul,* 671 F.2d 1162, 1167 (8th Cir.1982); *Gunther v. Iowa State Men's Reformatory,* 612 F.2d 1079, 1086 (8th Cir.), *cert. denied,* 446 U.S. 966, 100 S.Ct. 2942, 64 L.Ed.2d 825 (1980).   Of course, to the extent that the 1978 ADEA Amendments conflict with existing state mandatory retirement statutes, the Supremacy Clause dictates that federal law prevail. *EEOC v. County of Santa Barbara,* 666 F.2d 373, 378 (9th Cir.1982); *see Burbank v. Lockheed Air Terminal, Inc.,* 411 U.S. 624, 638–39, 93 S.Ct. 1854, 1862, 36 L.Ed.2d 547 (1973); *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).[17]

Defendant next contends that the magistrate erred in requiring the City, in order to prevail on its BFOQ defense, to demonstrate *either* that it had a factual basis for believing that all or substantially all persons over age 55 would be unable to perform safely and effectively the duties of the job, *or* that "it is impossible or impracticable to deal with persons over the age limit on an individual basis."   Decision and Order at 9, quoting *Johnson v. Baltimore,* 515 F.Supp. 1287, 1295 (D.Md.1981), *cert. denied,* 455 U.S. 944, 102 S.Ct. 1440, 71 L.Ed.2d 656 (1982).   Citing this court's decision in *Hodgson v. Greyhound Lines, Inc.,* 499 F.2d 859 (7th Cir.1974), *cert. denied,* 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 822 (1975), the City argues that it should only have been required to show that it made a "good faith judgment concerning the safety needs" of its citizens, and that its mandatory retirement policy should be upheld as long as that policy is "not the result of an arbitrary belief lacking in objective reason or rationale."   Appellee's Br. at 30, quoting *Greyhound, supra,* 499 F.2d at 863.   We reject such an expansive reading of the *Greyhound* decision.   In that case, an unsuccessful job applicant challenged, under the ADEA, Greyhound's policy of refusing to consider applications for intercity bus drivers from persons over 35 years of age. This circuit, in one of the first federal appellate decisions to interpret the BFOQ exception, refused to impose upon Greyhound the strict requirement that it establish, to a certainty, that all or substantially all applicants over age 40[18] would be unable to

---

16.  *See, e.g.,* H.R.Rep. No. 913, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 2811, 2850 ("The committee expects that expanded coverage under the Age Discrimination in Employment law will remove discriminatory barriers against employment of older workers in government jobs at the Federal and local government levels as it has and continues to do in private employment."); 120 Cong.Rec. 8768 (1974) (remarks of Senator Benson) ("The passage of this measure insures that Government employees will be subject to the same protections against arbitrary employment based on age as are employees in the private sector.").

17.  *See also* 29 C.F.R. § 1625.6(c) (1981 Supp.):
    Many State and local governments have enacted laws or administrative regulations which limit employment opportunities based on age.   Unless these laws meet the standards for the establishment of a valid bona fide occupational qualification under section 4(f)(1) of the Act, they will be considered in conflict with and effectively superseded by the Act.

18.  Although Greyhound's hiring policy disqualified all applicants over age 35, the ADEA protects only those persons between the ages of 40 and 70.

perform the duties of the job in question. Rather, the court held that in order to prevail on its BFOQ defense, Greyhound was required to demonstrate only "that the essence of its operations [i.e., the safe transportation of passengers] would be endangered by hiring drivers over forty years of age." 499 F.2d at 862. The court went on to conclude that Greyhound had met this burden by introducing "an array of evidence" relating, *inter alia,* to the rigors of Greyhound's extra-board work assignment system (under which those drivers with the least seniority, regardless of age, are forced to accept the longest and most arduous route assignments), the degenerative and hard-to-detect physical and sensory changes which begin in a person's late thirties and progress steadily thereafter, and the statistically documented fact

> that Greyhound's safest driver is one who has sixteen to twenty years of driving experience with Greyhound and is between fifty and fifty-five years of age, an optimum blend of age and experience with Greyhound which could never be attained in hiring an applicant forty years of age or older.

499 F.2d at 863.

In sustaining Greyhound's BFOQ defense, this court also relied heavily on the inability ·of individualized testing to achieve Greyhound's safety goals. The court emphasized that while a hiring program based on "functional" rather than chronological age might be desirable, "it is unclear that functional age is readily or practicably determinable" in this context. *Id.* at 864. Moreover, the court noted that

> [e]ven assuming that Greyhound's examinations of driving skills other than the physical examination can adequately screen out degenerative disabilities occasioned by age in the forty to sixty-five age bracket, it is questionable whether Greyhound could practicably scrutinize

the continued fitness of such drivers on a frequent and regular basis.

*Id.* Finally, the court noted with approval Greyhound's contention that

> even though an applicant between age forty and sixty-five may satisfactorily perform on the driver qualification examinations so that at the outset he would be entitled to employment, there is no way of telling how safely he will perform for a sustained period of time given the fact that he will be assigned to the arduous tasks involved on the extra-board at a time when his body begins to undergo degenerative changes due to the aging process.

*Id.* On the basis of this evidence, as well as the extensive medical, statistical and expert industry testimony introduced by Greyhound, the court concluded that Greyhound had succeeded in demonstrating both the "reasonableness" and the "necessity" of its challenged hiring rule.

We thus read *Greyhound* as supporting the view that, in order to prevail on a BFOQ defense, an employer must show that the challenged age qualification is reasonably related to the "essential operation" of its business, *and* must demonstrate *either* that there is a factual basis for believing that all or substantially all persons above the age limit would be unable to effectively perform the duties of the job, *or* that it is impossible or impracticable to determine job fitness on an individualized basis.[19] Such a two-pronged interpretation of the BFOQ defense is consistent with the standard adopted by the Fifth Circuit in *Usery v. Tamiami Tours, Inc.,* 531 F.2d 224, 235–36 (5th Cir.1976), which relied on the same Fifth Circuit cases cited by the *Greyhound* court; it also accords with the approach taken by virtually every other circuit that has addressed the scope of the BFOQ exception. *See, e.g., Tuohy v. Ford Motor Co.,* 675 F.2d 842, 844–46 (6th Cir.1982); *Stew-*

---

**19.** In this way, the employer satisfies both the "reasonableness" and the "necessity" elements of the BFOQ defense. *See Usery v. Tamiami Tours, Inc.,* 531 F.2d 224, 235–36 (5th Cir.1976). One way of satisfying these elements is to establish—as Greyhound did—that some members of the excluded class possess a trait (or traits) precluding safe and effective job performance, which cannot be ascertained by means other than reference to the applicant's chronological age.

*art v. Smith,* 673 F.2d 485, 491 n. 26 (D.C. Cir.1982); *Smallwood v. United Airlines,* 661 F.2d 303, 307 (4th Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2299, 73 L.Ed.2d 1302 (1982); *Harriss v. Pan American World Airways,* 649 F.2d 670, 676 (9th Cir.1980); *Houghton v. McDonnell Douglas Corp.,* 553 F.2d 561, 564 (8th Cir.), *cert. denied,* 434 U.S. 966, 98 S.Ct. 506, 54 L.Ed.2d 451 (1977).[20]

■ Moreover, such a two-pronged formulation of the employer's burden tracks, almost verbatim, the BFOQ regulations recently adopted by the EEOC. *See* 46 Fed.Reg. 47,727 (1981) (to be codified at 29 C.F.R. § 1625.6).[21] As noted earlier, such regulations are entitled to considerable weight. *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971). We thus conclude that the magistrate did not err in requiring the City, in order to prevail on its BFOQ defense, to demonstrate *either* that all or substantially all persons over age 55 would be unable to safely and effectively perform firefighting duties, *or* that at least some employees over age 55 possess a disqualifying trait that cannot practicably be ascertained by means other than automatic exclusion on the basis of age.

### IV

Finally, the City contends that, regardless of the proper legal standard, the medical and other scientific evidence adduced at trial supports its selection of age 55 as a

valid BFOQ. We disagree. The only scientific evidence presented at trial was that of plaintiff's expert, Dr. Michael Pollack. Dr. Pollack, an expert in the field of physiology, testified that age affects physical fitness in a number of ways, and that a wide variety of tests are available to determine fitness on an individual basis. Dr. Pollack also testified that although fitness generally decreases with age, it is possible to significantly modify this downward trend through a planned program of physical exercise. Tr. 488. With regard to the risk of heart attack (a justification for the age 55 rule urged strenuously by the City below), Dr. Pollack stated that age is only one of nine primary risk factors, and that an individual's susceptibility to heart attack, like an individual's general physical fitness, can be determined through individualized testing. Tr. 493–94.[22] Finally, Dr. Pollack testified that despite his extensive research in the area, he has failed to uncover any scientific evidence indicating that persons over age 55 should be terminated from physically demanding jobs such as firefighting. Tr. 498.

In defense of its mandatory retirement age, the City offered no medical or scientific testimony whatsoever. Instead, it relied upon a series of reports, made by the Wisconsin Retirement Research Committee, that chronicle the legislative history of the Wisconsin Retirement Fund Act. These reports, if anything, support the plaintiff's position here. As the magistrate found, the

**20.** *See also Beck v. Manheim,* 505 F.Supp. 923 (E.D.Pa.1981); *Aaron v. Davis,* 414 F.Supp. 453 (E.D.Ark.1976); *cf. Murnane v. American Airlines, Inc.,* 667 F.2d 98 (D.C.Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1770, 72 L.Ed.2d 174 (1982) (finding maximum hiring rule for pilots justified by "credible and persuasive" evidence that best experience for flight captain position was experience with same airline in lower-level flight job).

**21.** Section 1625.6(b) of the regulations provides:

An employer asserting a BFOQ defense has the burden of proving that (1) the age limit is reasonably necessary to the essence of the business, and either (2) that all or substantially all individuals excluded from the job involved are in fact disqualified, or (3) that

some of the individuals so excluded possess a disqualifying trait that cannot be ascertained except by reference to age.

The EEOC regulation goes on to state:

If the employer's objective in asserting a BFOQ is the goal of public safety, the employer must prove that the challenged practice does indeed effectuate that goal and that there is no acceptable alternative which would better advance it or equally advance it with less discriminatory impact.

*Id.*

**22.** Similar expert testimony was presented and credited heavily by the court in *Johnson v. Baltimore,* 515 F.Supp. 1287, 1298–99 (D.Md. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1440, 71 L.Ed.2d 656 (1982).

reports indicate that the Wisconsin Retirement Fund's choice of age 55 as a "normal retirement date" for protective service employees was not based on any scientific or medical data but, rather, was founded upon (1) a concern for public safety based upon the *subjective belief* that the aging process would take its toll particularly quickly on the physical and mental skills of these employees;[23] and (2) the need to have a definite and financially feasible age upon which a retirement benefit formula could be based. Indeed, with regard to this latter item, the magistrate specifically found that "[o]bviously, the cost factor and uniformity in application played dominant roles in retirement age selection." Decision and Order at 14.

These considerations are insufficient to support the City's BFOQ defense. First, it is well established that economic factors cannot be the basis for a BFOQ, since precisely those considerations were among the targets of the ADEA. *Smallwood v. United Airlines, Inc.*, 661 F.2d 303, 307 (4th Cir.1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 2299, 73 L.Ed.2d 1302 (1982); *see* 29 C.F.R. § 860.103(h) (1981) (superseded); *cf. Los Angeles Dep't of Water & Power v. Manhart*, 435 U.S. 702, 716, 98 S.Ct. 1370, 1379, 55 L.Ed.2d 657 (1978) (cost-justification defense not available in Title VII action). Moreover, although public safety is certainly a legitimate municipal goal, the ADEA requires that the use of mandatory retirement schemes to achieve this goal be based on something more than mere speculation or the subjective belief that older employees are generally less capable of handling the rigors of a physically demanding job. As the Sixth Circuit recently stated, "[w]hen an employer seeks to justify denying employment on the basis of a BFOQ which

relates to the safety of persons other than the one claiming discrimination, a particular inquiry into the effect of aging on the ability to perform safely is called for." *Tuohy v. Ford Motor Co.*, 675 F.2d 842, 844 (6th Cir.1982); *see supra* note 21.

We agree with the conclusion of the magistrate that no such "particularized inquiry" was undertaken in the instant case. As the magistrate stated in his decision, there is virtually no evidence in the record to indicate that the City, in setting age 55 as its compulsory retirement age, conducted "the appropriate balancing test that the policy underlying the ADEA requires. Age 55 simply represented a convenient age to select, and it was some age, any age, upon which a benefit formula could be structured." Decision and Order at 14. Moreover, the City's raising of its mandatory retirement age from 55 to 60, on July 1, 1980, further undercuts any claim that compulsory retirement of firefighters at age 55 is necessary to the "essential operation" of the Wauwatosa fire department.

To be sure, where, as here, public safety is the "essence" of a particular employer's business, that factor obviously becomes an important occupational and legal concern. Consequently, employers whose businesses are safety-related are likely to have less difficulty than other employers in establishing that *some* retirement age below the federally protected limit of 70 qualifies as a valid BFOQ. *See, e.g., EEOC v. County of Santa Barbara*, 666 F.2d 373, 377 (9th Cir. 1982); *Hodgson v. Greyhound Lines, Inc.*, 499 F.2d 859, 863 (7th Cir.1974), *cert. denied*, 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 822 (1975). However, this does not relieve an employer from the burden of justifying the *particular* age limitation adopted—that is, from demonstrating *either* that all or

---

**23.** Thus, with regard to the selection of an appropriate "normal retirement age," the 1964 Retirement Research Committee report stated,

Such determinations, unfortunately, must of necessity be based primarily on subjective findings; scientific evidence with respect to the aging process is simply not available to the extent necessary to permit orderly, objective analysis.

Def.Ex. B at 8. Of course, the fact that little objective, scientific data may have been available at the time the City initially set its mandatory retirement age, does not excuse the City's failure to later substantiate that age determination once such evidence became available, particularly in light of the 1974 and 1978 Amendments to the ADEA.

substantially all members of the excluded class are incapable of safe and effective job performance, *or* that there exists no practical alternative, for purposes of determining job fitness, to compulsory retirement on the basis of chronological age. Based upon our own careful review of the record in this case, we agree with the magistrate that the City has failed to meet either of these criteria and, hence, cannot prevail on its BFOQ defense.

### V

Having affirmed the magistrate's finding of liability, we turn now to the question of damages. Pursuant to 29 U.S.C. § 626(b) (1976), the magistrate in this case awarded both actual and liquidated (or double) damages.[24] The magistrate included in his award of actual damages an amount representing Orzel's lost salary and benefits from the date he was terminated until he actually returned to work on February 1, 1981. The magistrate, however, deducted from his total damage award all amounts received by the plaintiff from unemployment compensation benefits and from retirement pension benefits. The magistrate noted that reduction of a damage award to take into account such "collateral source benefits" is normally a matter within the discretion of the district court, *see EEOC v. Sandia Corp.,* 639 F.2d 600, 624–26 (10th Cir.1980), and stated that he saw no reason in the instant case to provide plaintiff with such double recovery for his lost employment. Decision and Order at 18, citing *EEOC v. Enterprise Ass'n Steamfitters,* 542 F.2d 579, 591 (2d Cir.1976), *cert. denied,* 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1979). Orzel has not appealed this determination, and we agree that the magistrate did not abuse his discretion in deducting these amounts from plaintiff's damage award.

The magistrate also deducted from his total damage award the sum of $425, representing plaintiff's interim earnings as a temporary census taker. On appeal, defendant claims that Orzel's damages should be reduced much further, because Orzel, in failing to secure other full-time employment, violated his duty to mitigate damages. In support of this argument, the City relies heavily upon *Sangster v. United Airlines, Inc.,* 633 F.2d 864 (9th Cir.1980), *cert. denied,* 451 U.S. 971, 101 S.Ct. 2048, 68 L.Ed.2d 350 (1981). The facts of *Sangster,* however, are not at all analogous to those of the instant case. In *Sangster,* a former airline stewardess remained unemployed for eight years after she was denied a requested transfer from a supervisory to an inflight position because of her sex and marital status. The plaintiff in *Sangster,* after quitting her job at United, did not apply to other airlines, nor did she register with any employment agency or apply for unemployment benefits during the entire eight-year period she was out of work. Moreover, Sangster admitted at trial that she knew, during at least part of her term of unemployment, of an available supervisor's position, and, perhaps more important, that "she never even attempted to procure a job as a stewardess, the work she considered preferable to her position as stewardess supervisor." 633 F.2d at 868.

In the case before us, by contrast, a 55-year-old plaintiff who had been involuntarily retired, secured one part-time job and applied for another, full-time, position during a two-year period.[25] The record also shows that Orzel placed his name on file with the Wisconsin Job Service in an effort to seek whatever employment was available. In light of these facts, we believe that this case is not controlled by the *Sangster* reasoning but, rather, is more analogous to this court's decision in *Sprogis v. United Airlines, Inc.,* 517 F.2d 387 (7th Cir.1975). In *Sprogis* we held that an employment discrimination plaintiff's formal application for one job and her procurement of another, temporary, position during a two-year peri-

---

24. The text of 29 U.S.C. § 626(b) (1976) is reprinted at note 3, *supra.*

25. Orzel worked during 1980 as a temporary census taker. He also applied for a job with the U.S. Postal Service but was not hired.

od constituted "reasonable diligence" in attempting to find alternative employment, and we thus rejected defendant's "failure to mitigate" argument. 517 F.2d at 392. Similarly, we agree with the magistrate that Orzel's efforts here, while perhaps "less than vigorous," did not constitute a violation of his duty to mitigate damages.

The City next argues that, in any event, it should not be held liable for any damages incurred by the plaintiff subsequent to December 18, 1979, the date on which the City first offered to reinstate Orzel.[26] Defendant's offer to reinstate Orzel, however, was expressly conditioned upon Orzel's taking and passing a physical exam arranged by the City. Orzel refused to comply with this condition on the advice of his attorney, who believed that acquiescence in the demand for a physical exam might be detrimental to the prosecution of Orzel's discrimination suit. We agree with the magistrate that, under the circumstances, it was not unreasonable for Orzel to be concerned that acceptance of the City's conditional offer would jeopardize his legal position.

At the time the conditional offer of reinstatement was made, the City had not yet agreed to stipulate that Orzel was physically capable of performing all firefighting duties, even though the plaintiff, as part of a trial procedure, had taken and "passed with flying colors" a physical exam just four months earlier, a copy of which his counsel was apparently willing to furnish the City. *See* Def.Ex. V. Moreover, the evidence shows that the City was unwilling to back up its offer of reinstatement with a written agreement to retain Orzel until at least age 60; instead, the City continued to assert that it was inclined to reterminate Orzel's employment as soon as any legal decision appeared to give it the right to do so. In addition, we note that Orzel may have had particular reason to question the City's motives in this case, since the City had earlier withdrawn a settlement offer that Orzel had apparently accepted, on the ground that the City's employment relations committee, which had extended the offer, had no authority to make binding settlement offers. *See* Record at 10, 18. Under these circumstances, we do not believe it was unreasonable for Orzel, on the advice of his attorney, to refuse the City's conditional offer to return to work. We therefore reject the City's contention that it should not be held liable for any damages accruing after December 18, 1979.

Finally, defendant argues that the magistrate erred in concluding that the City had committed a willful violation of the ADEA and, hence, in awarding liquidated damages under section 626(b) of the Act.[27] Recently, in *Syvock v. Milwaukee Boiler Mfg. Co.*, 665 F.2d 149 (7th Cir.1981), this court articulated the proper standard for identifying a willful violation of the ADEA.[28] In that case, Judge Pell, writing for a unanimous panel, stated that the standard for willfulness "should focus on the defendant's state of mind at the time the allegedly discriminatory acts occurred. It must distinguish those situations in which an employer consciously discriminates

---

**26.** When testimony regarding this reinstatement offer was first introduced at trial, the plaintiff objected under Rule 408 of the Federal Rules of Evidence, claiming that the testimony should be excluded as an offer made in settlement of the litigation. The magistrate acknowledged that the City's offer of reinstatement was made after commencement of the instant lawsuit, but admitted the testimony as an exception to the exclusionary rule because he deemed it relevant to the issue of mitigation of damages.

**27.** An award of liquidated damages under 29 U.S.C. § 626(b) (1976) essentially doubles the plaintiff's recovery of backpay and benefits.

*Syvock v. Milwaukee Boiler Mfg. Co.*, 665 F.2d 149, 151 (7th Cir.1981).

**28.** At the time the magistrate issued his decision in the instant case, *Syvock* had not yet been decided. The magistrate therefore relied upon the standard for willfulness adopted by the Third Circuit in *Wehr v. Burroughs Corp.*, 619 F.2d 276, 280 (3rd Cir.1980), and endorsed by the Ninth Circuit in *Kelly v. American Standard, Inc.*, 640 F.2d 974, 980 (9th Cir.1981). This court, in *Syvock*, expressed its approval of the reasoning used in both *Wehr* and *Kelly. See Syvock, supra*, 665 F.2d at 154–56 & nn. 9–10.

against an employee from those in which the discrimination is unconscious." 665 F.2d at 155.

■ The *Syvock* court then held that, in order to prove willfulness under 29 U.S.C. 626(b) (1976), an ADEA plaintiff: must show that the defendant's actions were knowing and voluntary and that he knew or reasonably should have known that those actions violated the ADEA. *Id.* at 156 (footnote omitted). In a footnote, the *Syvock* court denied that application of this standard would place an "insurmountable burden" on ADEA plaintiffs, and explained that, to meet the latter aspect of this test, a plaintiff must show (1) that the employer knew or reasonably should have known what the requirements of the ADEA were; and (2) that the employer knew or reasonably should have known that his actions towards the plaintiff were inconsistent with those requirements. 665 F.2d at 165 n. 10. The court further noted that in a disparate treatment case "a finding of willfulness will generally require some direct evidence of discriminatory intent ... or a showing that, at the time of the alleged discriminatory action, the employer was motivated to discriminate or *engaged in a pattern of discriminating against older employees.*" *Id.* (emphasis supplied). Finally, the *Syvock* court stated that "[t]he determination whether the employer knew or should have known that his actions toward the plaintiff were inconsistent with the law is a determination left to the jury in the first instance." *Id.* In other words, in a trial to the court, this determination constitutes a finding of fact, to which the "clearly erroneous" standard applies. *See Pullman-Standard v. Swint*, 456 U.S. 273, 285–90, 102 S.Ct. 1781, 1788–91, 72 L.Ed.2d 66 (1982) (district court's determination as

to discriminatory intent is factual finding, reversible only if "clearly erroneous" under Fed.R.Civ.P. 52(a)).

■ Applying these standards to the facts of the instant case, we conclude that the magistrate did not err in determining that the City's forced retirement of Orzel, on December 31, 1978, constituted a willful violation of the ADEA. In reaching this conclusion, the magistrate first noted that "[a]n award of liquidated damages does not automatically flow from a proven violation of the Act, because the plaintiff need not establish the defendant's state of mind as part of his prima facie case." Rather, "[a] 'knowing and voluntary' violation of the ADEA is necessary to entitle a party to liquidated damages." Decision and Order at 21. This reasoning tracks precisely the analysis employed by the court in *Syvock*, *see* 665 F.2d at 154–56. Next, the magistrate carefully reviewed the legal and factual circumstances surrounding the plaintiff's termination in order to analyze "defendant's state of mind at the time the allegedly discriminatory acts occurred." *Syvock, supra,* 665 F.2d at 155. The magistrate noted that, prior to the effective date of the 1978 ADEA amendments (April 6, 1978), section 623(f)(2) of the Act arguably permitted employers to discriminate on the basis of age if such actions were taken pursuant to the terms of a bona fide retirement plan; in other words, until April 1978, the City's mandatory retirement of firefighters pursuant to the terms of the Wisconsin Retirement Fund was arguably justified under section 623(f)(2) of the ADEA. The 1978 Amendments, however, clearly and unequivocally removed this exception, and there is ample evidence in the record that the City was indeed aware of these amendments.[29] The record also discloses

29. For example, the City Attorney for Wauwatosa testified that, at the request of the City's employee relations committee, he made various efforts during the early part of 1978 to determine the effect of the 1978 Amendments on the mandatory retirement of local police and firefighters. *See* Tr. 379–80. Although the City Attorney initially concluded that the amendments did not change the law as it pertained to

the mandatory retirement of firefighters and law enforcement personnel, he later rejected this conclusion and advised the City that

[i]t appears rather clear that with the 1978 Amendments to the Federal Age Discrimination in Employment Act [ ] the involuntary retirement of most employees prior to reaching the age of seventy is now prohibited, even though there is a bona fide pension plan

that on November 15, 1978, counsel for the plaintiff advised the mayor of Wauwatosa that it was his "considered opinion after carefully researching and reviewing all prior precedents concerning this issue," that the City's demand for Orzel's mandatory retirement "is in direct violation" of the ADEA. Pl.Ex. 2 (letter from plaintiff's attorney to Mayor James A. Benz). The letter further advised the mayor of "several Federal court decisions" that had applied the ADEA's proscriptions to the mandatory retirement of local firefighters and police officers. *Id.* So far as the record reveals, the City made no response to this letter.

Moreover, as the magistrate noted, although there was no definitive law in this circuit at the time Orzel was forced to retire, the same was not true elsewhere. For example, in 1976, the court in *Aaron v. Davis,* 414 F.Supp. 453 (E.D.Ark.), *reh'g denied,* 424 F.Supp. 1238 (E.D.Ark.1976), held that the mandatory retirement, pursuant to local ordinance, of an Assistant and a District Fire Chief at age 62 violated the ADEA. The *Aaron* court, in a thorough and well-reasoned opinion, explicitly rejected the defendant municipality's argument that the mandatory retirement of local firefighters at age 62 constituted a bona fide occupational qualification under section 623(f)(1) of the ADEA. 414 F.Supp. at 460–63. And in *Arritt v. Grisell,* 567 F.2d 1267 (4th Cir.1977), the Fourth Circuit held that Congress had not exceeded its constitutional authority in extending the proscriptions of the ADEA to state and local governments, thus addressing a constitutional defense upon which the City relied heavily at the lower court stage of these proceedings. Finally, this circuit's decision in *Hodgson v. Greyhound Lines, Inc.,* 499 F.2d 859 (7th Cir.1974), *cert. denied,* 419 U.S. 1122, 95 S.Ct. 805, 42 L.Ed.2d 822 (1975), also rendered well before the effective date of Orzel's termination, should have alerted the City to the substantial evidentiary foundation necessary to establish a BFOQ defense—a foundation which the City never attempted to develop here.

In light of these factual and legal circumstances, we agree with the magistrate's implicit conclusion that the City knew or reasonably should have known of the requirements of the ADEA and that the City knew or reasonably should have known that its termination of Orzel was inconsistent with those requirements. *Syvock, supra,* 665 F.2d at 165 n. 10:

> The defendant in terminating plaintiff did not proceed in ignorant bliss. It knew, or should have known, that the 1974 amendments to the ADEA had been held to apply to local government as regards its protective occupation employees. The same would be true for the 1978 amendments. The defendant did not proceed maliciously, but it proceeded upon the calculated belief that the decisions in other areas of the country would either be found to be erroneous or not applicable in this circuit.
>
> The defendant should not be able to avoid the imposition of liquidated damages by either closing its eyes to the 1978 amendments or by choosing legal advice more palatable to its position.

Decision and Order at 23. Moreover, even if reasonable minds could differ on this issue, we could not, pursuant to the applicable standard of review, characterize the district court's determination of willfulness as "clearly erroneous" under Federal Rule of Civil Procedure 52(a). *See Pullman-Standard v. Swint, supra,* 102 S.Ct. at 1791. We also note that, in the course of his deliberate and balanced analysis, the magistrate *disallowed* several items of claimed compensation at the same time as he *allowed* liquidated damages. *See* pp. 756–757 *supra.*

## CONCLUSION

For the reasons discussed above, we affirm the magistrate's conclusion that the

---

providing for mandatory retirement at an age prior to seventy.

Def.Ex. T at 1 (letter from City Attorney to Wauwatosa Employee Relations Committee,

dated November 20, 1979); *compare* Def.Ex. S (letter from City Attorney to Employee Relations Committee, dated June 12, 1978).

City's age 55 mandatory retirement rule for firefighters does not constitute a valid BFOQ under section 623(f)(1) of the ADEA. We also affirm the magistrate's finding of a willful violation of the Act, and uphold the resulting award of damages in all respects.

AFFIRMED.

PELL, Circuit Judge, concurring.

I am persuaded by Judge Cudahy's well-reasoned opinion, and my own participation in reading the briefs and hearing oral argument that a proper result has been reached in this case. I therefore concur in his opinion.

Nevertheless, I deem it appropriate to comment on what I regard as some of the troublesome aspects of this case. If I were viewing the matter of whether compulsory retirement of fire fighters at the age of 55 was a bona fide occupational qualification (BFOQ) as a matter of first impression, rather than, as we must, in the context of well established law, I might have been inclined to say that it was a reasonably necessary BFOQ.

I am not impressed by the fact that there had been no major fires in Wauwatosa in many years. There is no crystal ball to foretell when catastrophe will pay a visitation. It can and does happen. The fire department should be prepared to cope, having for that purpose adequate equipment and corps of physically and mentally able fire fighters.

Judge Cudahy's opinion refers to "the degenerative and hard-to-detect physical and sensory changes which begin in a person's late thirties and progress steadily thereafter." This is a fact of life and pointing out the Bernarr Macfaddens who exist does not refute it. It is simply a part of the aging process. Not only does a fire fighter have to be prepared to engage in strenuous physical activity but he or she must have the reaction timing of a young person. Quick decisions, indeed quick intuitive reactions, followed by accelerated action can be required.

It can't be argued, I believe, that these degenerative processes do not apply with some degree of equality to all of the physiological and psychological aspects of a human being. These include the respiratory system. From newspaper reports of fires, oftentimes not a major fire in a residence, we know the cause of fatalities frequently is asphyxiation rather than incineration. I am not unmindful that fire departments often have a rule that its fire fighters not enter a burning structure without wearing gas masks. Yet, we know also that fire fighters as well as occupants are sometimes overcome by the deadly fumes released by certain combustible materials.

We, however, are not considering the matter on an a priori basis. As Judge Cudahy's opinion correctly points out, the burden is on the employer to demonstrate that the BFOQ is reasonably necessary to the normal operation of the particular business. This, Wauwatosa, despite its protestations to the contrary, simply has failed to do. Judge Cudahy's opinion refers to federal fire fighters as "a wholly different group of employees, operating under different working conditions and performing significantly different job functions." It strikes me that "a rose is a rose is a rose" might be applicable here but Wauwatosa has failed to demonstrate any nexus between the federal and municipal fire fighters' situation, nor that Congress implicitly intended to include *all* fire fighters in those to be treated in the BFOQ category.

The setting of a retirement age as a BFOQ in certain occupations would seem to be a permissible governmental objective and in the case of fire fighters this would relate both to the citizens of the community and the fire fighters themselves. Wauwatosa has failed to demonstrate that this age should be 55.

I am also troubled by the matter of not stopping the assessment of damages as of the date when Orzel was offered reinstatement. It seems to me that the condition of taking a physical examination prior to his reassuming the potentially arduous duties was not an unreasonable one. If he had

been offered unconditional reinstatement, I would assume that he would have been subject to periodic required physical examinations. In view, however, of all of the peculiar circumstances in this case, as outlined in Judge Cudahy's opinion, I am unable to state that the result reached was incorrect.

Finally, the matter of allowing liquidated damages is always a difficult area in application. Congress clearly did not intend, as it did in other areas such as the Fair Labor Standards Act, this to be an automatic doubling.

The present case, in view of the then less settled law, and the recent inclusion of municipalities strikes me as a close case on liquidated damages; nevertheless, I think the opinion of Judge Cudahy correctly applies the principles of *Syvock v. Milwaukee Boiler Manufacturing Co.*, 665 F.2d 149 (7th Cir.1981).