UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 94-1863

THOMAS R. LUSSIER,
Plaintiff, Appellant,

v.

MARVIN RUNYON, UNITED STATES POSTMASTER GENERAL,
Defendant, Appellee.
 

No. 94-1946

THOMAS R. LUSSIER,
Plaintiff, Appellee,

v.

MARVIN RUNYON, UNITED STATES POSTMASTER GENERAL,
Defendant, Appellant.
 

ERRATA SHEET ERRATA SHEET

The opinion of the Court issued on March 29, 1995, is
corrected as follows:

On page 3, line 8 change "504(a)" to "501"

On page 3, line 9 change "794(a)" to "791"

On page 4, line 14 change "794(a)" to "791"

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT


No. 94-1863

THOMAS R. LUSSIER,
Plaintiff, Appellant,

v.

MARVIN RUNYON, UNITED STATES POSTMASTER GENERAL,
Defendant, Appellee.


No. 94-1946

THOMAS R. LUSSIER,
Plaintiff, Appellee,

v.

MARVIN RUNYON, UNITED STATES POSTMASTER GENERAL,
Defendant, Appellant.


APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge] 



Before

Selya, Circuit Judge, 
Bownes, Senior Circuit Judge, 
and Stahl, Circuit Judge. 



John F. Lambert, Jr., with whom Thomas V. Laprade and Black, 
Lambert, Coffin & Rudman were on brief, for plaintiff. 
Jeffrey A. Clair, with whom Frank W. Hunger, Assistant 
Attorney General, Jay P. McCloskey, United States Attorney, 
Robert S. Greenspan and Sandra Wien Simon, Attorneys, Appellate 
Staff, Civil Division, Dep't of Justice, were on brief, for
defendant.



March 29, 1995


SELYA, Circuit Judge. After determining that the SELYA, Circuit Judge. 

United States Postal Service (the Service) wrongfully discharged

Thomas Lussier because of his post-traumatic stress disorder, the

district court made an award that included future damages,

sometimes called "front pay." Both parties consider the award to

be a dead letter. Their cross-appeals pose two kinds of

questions. The principal inquiry implicates the collateral

source rule and requires us to decide whether a district court

may tailor a front pay award, stemming from a finding of

disability discrimination under the Rehabilitation Act of 1973,

Pub. L. No. 93-112, 87 Stat. 355 (codified as amended at 29

U.S.C. 701-796i), to account for an increase in Veterans

Administration (VA) benefits occasioned by the adverse employment

action. The second inquiry also touches upon the collateral

source rule, but turns on a determination of when, and under what

circumstances, a district court, after the parties have rested,

may solicit and consider factual information germane to an issue

in the case without formally reopening the record.

On the first issue, we hold that it is within the trial

court's discretion to tailor a front pay award to take account of

collateral benefits in a discrimination case, and that the court

acted within the realm of this discretion in the case at bar. On

the second issue, we hold that once the record is closed, a

district court, absent waiver or consent, ordinarily may not

receive additional factual information of a kind not susceptible

to judicial notice unless it fully reopens the record and

3

animates the panoply of evidentiary rules and procedural

safeguards customarily available to litigants. Finding, as we

do, that the district court transgressed this rule, we cancel the

award and stamp the matter "returned to sender."

I. BACKGROUND I. BACKGROUND

Lussier sued his quondam employer in Maine's federal

district court alleging, inter alia, that his discharge from the 

Service on March 4, 1992, amounted to disability discrimination

in violation of section 501 of the Rehabilitation Act of 1973, 29

U.S.C. 791.1 A bench trial ensued. Since these appeals focus

exclusively on the front pay award and do not concern either the

antecedent question of liability or the propriety of other

remedies, we discuss only the evidence relating to the form and

amount of front pay.

The plaintiff's expert, Dr. Allan McCausland, testified

that, had Lussier not been fired, his future earnings and fringe

benefits over a projected 25-year work expectancy would have

aggregated between $790,805 and $1,067,193 when reduced to

present value. The Service did not directly contradict these

estimates, but introduced evidence that Lussier's cloud had a

small silver lining; he had been receiving VA benefits for a

military-service-related disability, and the circumstances

surrounding his ouster from the post office exacerbated this

disability and triggered an increase in those benefits. Moreover
 

1The named defendant is the Postmaster General, but, for all
intents and purposes, the Service is the real party in interest,
and we treat it as such.

4

it is said, after all, that the postman always rings twice 

Patricia Asdourian, a Postal Service human resources specialist,

testified that Lussier would also be receiving disability

benefits through the Civil Service Retirement System (CSRS) as an

incident of his discharge. Lussier had applied for CSRS benefits

only a few weeks before trial and the precise benefit level was,

therefore, unknown. Nonetheless, Asdourian predicted that

Lussier's CSRS benefits would be in the neighborhood of $1185 per

month. The Service argued that the present value of both the

increase in VA benefits (calculated to be $358,401) and the CSRS

disability payments should be deducted from any front pay.

On November 9, 1993, the parties rested and the

district court took the case under advisement. In due course, it

found that the Service had discriminated against Lussier on

account of his disability in violation of 29 U.S.C. 791. See 

Lussier v. Runyon, No. 92-397-P-H, 1994 WL 129776, at *1 (D. Me. 

Mar. 1, 1994) (Lussier I). The court made an award to the 

plaintiff, see id. at *11, but declined to order reinstatement 

because, given the sequelae of the firing, Lussier could no

longer perform his accustomed duties. As to future damages, the

court found that Lussier would probably be capable at some point

of returning to lighter, lower-paying work, and estimated the

present value of Lussier's net future lost earnings and fringe

benefits to be $790,805. See id. at *9. The court also found, 

however, that Lussier was slated to receive increased VA benefits

worth $358,401 on a present-value basis. It determined that, to

5

prevent a possible windfall, these benefits should offset the

recovery Lussier otherwise might obtain as front pay. See id. at 

*9-*11.

The court adopted essentially the same reasoning in

respect to CSRS benefits, concluding that these benefits, like

the VA benefits, should be factored into Lussier's front pay

award to prevent overcompensation. See id. at *11 n.7. But 

there was a rub: declaring itself "unable to determine Lussier's

net economic loss without knowing the outcome of his CSRS

application," id. at *11, the court deferred entry of final 

judgment and ordered the parties to file reports within 30 days

concerning the outcome or status of Lussier's application for

CSRS benefits.

Though objecting to the court's request, Lussier

complied under protest. He submitted status reports (the last

dated May 2, 1994) disclosing that he was receiving $390 per

month in CSRS benefits on an interim basis "pending determination

of his final entitlement." Lussier v. Runyon, No. 92-397-P-H, 

1994 WL 247873, at *1 (D. Me. May 24, 1994) (Lussier II). The 

Service, by contrast, gave the court no concrete information

within the 30-day period. It then compounded its omission by

ignoring the court's instruction, issued on April 21, directing

it to respond within ten days. Judge Hornby, unwilling to wait

any longer, entered final judgment on May 24, 1994. Based mainly

on the lack of any submission by the Service, the judge seized

upon the figure of $390 per month, computed the present value of

6

these monthly payments over Lussier's work expectancy ($112,723),

and offset this amount against the potential front pay award.

The court thereupon entered a final judgment that included

$320,000 in front pay (representing $790,805 in future lost

earnings, minus $358,401 in increased VA benefits, minus $112,723

in CSRS benefits).

Three days later, the Service moved to alter or amend

the judgment, Fed. R. Civ. P. 59(e), "to reflect the fact that a

final calculation of the plaintiff's [CSRS] disability retirement

annuity has now been made, resulting in a monthly payment

effective March 1, 1994, in the amount of $1,111." The district

court denied the motion, writing that:

The defendant has already had more generosity
than it deserves from my initial reopening of
the trial record and extensions thereafter.
Although the plaintiff may realize somewhat
of a "windfall" as a result, awarding the
defendant relief would make a mockery of all
judicial deadlines and the closing of a trial
record.

Both parties appeal.

II. COLLATERAL BENEFITS II. COLLATERAL BENEFITS

These appeals pose an important question: In what

manner, if any, does the collateral source rule which bars

resort to collateral benefits in connection with the calculation

of pecuniary damage awards, see 1 Dan B. Dobbs, Law of Remedies  

3.8(1), at 372-73 (2d ed. 1993) (describing the collateral source

rule as providing "that benefits received by the plaintiff from a

source collateral to the defendant may not be used to reduce that

defendant's liability for damages") apply to awards of front

7

pay? We respond by holding that insofar as front pay is

concerned, the effect to be given to collateral benefits 

whatever their source is within the equitable discretion of the

district court.2 Applying this general principle, we rule that

the court below acted within the proper sphere of its discretion

in tailoring the plaintiff's front pay award to account for

collateral benefits received by the plaintiff as a traceable

consequence of the defendant's statutory violation.

A. The Letter of the Law. A. The Letter of the Law. 

The Rehabilitation Act makes available in disability

discrimination cases the remedies authorized by Title VII of the

Civil Rights Act of 1964, see 29 U.S.C. 794a(a)(1), and Title 

VII, in turn, provides that a court may order "affirmative action

. . . which may include, but is not limited to, reinstatement or

hiring of employees, with or without back pay . . ., or any other

equitable relief as the court deems appropriate," 42 U.S.C. 

2000e-5(g). Under this generous language, courts commonly have

recognized front pay as a condign remedy. See, e.g., Saulpaugh 

v. Monroe Community Hosp., 4 F.3d 134, 145 (2d Cir. 1993), cert. 

denied, 114 S. Ct. 1189 (1994); Shore v. Federal Express Corp., 

777 F.2d 1155, 1158-60 (6th Cir. 1985); Thompson v. Sawyer, 678 

F.2d 257, 292 (D.C. Cir. 1982) (collecting cases); see also 

United States v. Burke, 112 S. Ct. 1867, 1873 n.9 (1992) (noting 

 

2We limit this holding to situations where, as here, (1)
front pay is a discretionary equitable remedy, and (2) there is
no statutory impediment to factoring collateral benefits into the
mix.

8

approvingly, in dictum, that "[s]ome courts have allowed Title

VII plaintiffs who were wrongfully discharged and for whom

reinstatement was not feasible to recover `front pay' or future

lost earnings"); Sinai v. New Eng. Tel. & Tel. Co., 3 F.3d 471, 

476 (1st Cir. 1993) (recognizing, in dictum, that front pay is an

acceptable form of redress under Title VII), cert. denied, 115 S. 

Ct. 597 (1994); cf. Wildman v. Lerner Stores Corp., 771 F.2d 605, 

614-16 (1st Cir. 1985) (explicitly recognizing front pay as an

equitable remedy under the analogous relief provision of the Age

Discrimination in Employment Act (ADEA), 29 U.S.C. 626(b)

(1988)).

These precedents illuminate our path. In light of

them, we hold that front pay is an available equitable remedy

under Title VII and, hence, under the Rehabilitation Act.

Nevertheless, confirming the propriety of the remedy merely takes

us to a way station, not to our destination. A further

expedition must be mounted if we are to plot the terrain where

the collateral source rule and the tenets that inform the

computation of front pay intersect.

We start along this route by acknowledging that front

pay, within the employment discrimination universe, is generally

equitable in nature. See, e.g., Shore v. Federal Express Corp., 

42 F.3d 373, 377-78 (6th Cir. 1994). It follows a fortiori from 

the equitable nature of the remedy that the decision to award or

withhold front pay is, at the outset, within the equitable 

discretion of the trial court. See, e.g., id.; Saulpaugh, 4 F.3d 

9

at 145; 2 Dobbs, supra, 6.10(4), at 214. This court has 

consistently reached the same conclusion with regard to front pay

in the ADEA context, see, e.g., Powers v. Grinnell Corp., 915 

F.2d 34, 42-43 (1st Cir. 1990); Wildman, 771 F.2d at 616, and we 

perceive no reason why front pay should be characterized

differently in respect to its dispensation under Title VII and,

correspondingly, under the Rehabilitation Act.3 We rule,

therefore, that statutes such as Title VII and the Rehabilitation

Act afford trial courts wide latitude to award or withhold front

pay according to established principles of equity and the

idiocratic circumstances of each case.

We think it follows from this premise that the

logically derivative question of whether a front pay award, if

granted, may be tailored to take collateral benefits into account

is also within the court's equitable discretion. This conclusion

is supported not only by the brute force of logic, see United 

States v. O'Neil, 11 F.3d 292, 296 (1st Cir. 1993) (explaining 

that "the grant of a greater power necessarily includes the grant

of a lesser power, unless the authority to exercise the lesser

power is expressly reserved"), but also by reference to precedent

and to an understanding of the fundamental nature of equity

itself. We canvass these sources.

1. Precedent. The weight of authority unquestionably 1. Precedent. 

favors the view that decisions about whether to consider the
 

3This is particularly true in view of the close relationship
between the ADEA and Title VII. See, e.g., McKennon v. Nashville 
Banner Publ. Co., 115 S. Ct. 879, 884 (1995). 

10

plaintiff's receipt of collateral benefits in gauging the

appropriateness and amount of front pay, and if so, how to

calibrate the scales, lie within the equitable discretion of the

trial court. See, e.g., Hukkanen v. International Union of 

Operating Eng'rs, 3 F.3d 281, 286 (8th Cir. 1993) (holding under 

Title VII that "calculation of front pay . . . is a matter of

equitable relief within the district court's sound discretion");

Johnson v. Chapel Hill Indep. Sch. Dist., 853 F.2d 375, 382 (5th 

Cir. 1988) (similar); see also Jackson v. City of Cookeville, 31 

F.3d 1354, 1360 (6th Cir. 1994) (applying abuse-of-discretion

test to evaluate district court's deduction of pension benefits

from an ADEA front pay award); Graefenhain v. Pabst Brewing Co., 

870 F.2d 1198, 1210 (7th Cir. 1989) (similar; specifically

stating that whether to deduct such collateral benefits "from a

front pay award is a matter committed to the discretion of the

trial court"). While the case law does not form a perfect

string, see, e.g., Doyne v. Union Elec. Co., 953 F.2d 447, 451-52 

(8th Cir. 1992) (holding that pension benefits should not be

considered in fashioning an ADEA front pay award), we deem this

virtually seamless array of precedents to be worthy of our

allegiance.

Our conviction that the majority rule is the better

rule is not weakened by the debate that has rent the circuits in

regard to whether collateral benefits should be subtracted from

11

back pay awards in employment discrimination cases.4 According

to our rough count, courts of appeals have divided four-to-three

on this issue. Compare EEOC v. Wyoming Retirement Sys., 771 F.2d 

1425, 1431 (10th Cir. 1985) (holding under the ADEA that

"[d]eduction of collateral sources of income from a back pay

award is a matter within the trial court's discretion") and Orzel 

v. City of Wauwatosa Fire Dep't, 697 F.2d 743, 756 (7th Cir.) 

(similar), cert. denied, 464 U.S. 992 (1983) and Merriweather v. 

Hercules, Inc., 631 F.2d 1161, 1168 (5th Cir. 1980) (similar in 

regard to Title VII back pay awards) and EEOC v. Enterprise Ass'n 

Steamfitters Local No. 638, 542 F.2d 579, 591-92 (2d Cir. 1976) 

(allowing district court to offset public assistance payments

against a Title VII back pay award), cert. denied, 430 U.S. 911 

(1977) with Craig v. Y & Y Snacks, Inc., 721 F.2d 77, 81-85 (3d 

Cir. 1983) (holding that unemployment compensation should not be

deducted from a Title VII back pay award) and Brown v. A.J. 

Gerrard Mfg. Co., 715 F.2d 1549, 1550-51 (11th Cir. 1983) (en 

banc) (similar) and EEOC v. Ford Motor Co., 688 F.2d 951, 952 

(4th Cir. 1982) (similar). Three other circuits have shown signs

 

4NLRB v. Gullett Gin Co., 340 U.S. 361 (1951), frequently 
cited in connection with the interplay between back pay and the
collateral source rule, is simply not determinative on this
issue. In Gullett Gin, the Court held that unemployment 
compensation need not be deducted from a back pay award under the
National Labor Relations Act. Id. at 364. But the Court did not 
furnish clear guidance as to whether the use of collateral
benefits was categorically disallowed or merely entrusted to the
trier's discretion. See 2 Dobbs, supra, 6.10(4), at 223-24; 
Thomas W. Lee, Comment, Deducting Employment Compensation and 
Ending Employment Discrimination: Continuing Conflict, 43 Emory 
L.J. 325, 326 (1994).

12

of an internal division. Compare Hawley v. Dresser Indus., Inc., 

958 F.2d 720, 726 (6th Cir. 1992) (approving the deduction of

pension benefits from an ADEA back pay award) with Rasimas v. 

Michigan Dep't of Mental Health, 714 F.2d 614, 627 (6th Cir. 

1983) (holding that "[u]nemployment benefits . . . should not be

deducted from backpay awards" under Title VII), cert. denied, 466 

U.S. 950 (1984); and compare Glover v. McDonnell Douglas Corp., 

12 F.3d 845, 848 (8th Cir.) (holding that the district court

erred in refusing to offset pension payments from an award of

back pay), cert. denied, 114 S. Ct. 1647 (1994) with Doyne, 953 

F.2d at 451-52 (contra);5 and compare Naton v. Bank of Cal., 649 

F.2d 691, 700 (9th Cir. 1981) (holding that district courts

possess discretion to deduct collateral benefits from back pay

awards in ADEA cases) with Kauffman v. Sidereal Corp., 695 F.2d 

343, 347 (9th Cir. 1982) (holding in a Title VII case that

"unemployment benefits received by a successful plaintiff in an

employment discrimination action are not offsets against a

backpay award").

While we tend to agree with those courts that have held

the interplay between collateral benefits and back pay to be a

matter within the district court's discretion,6 we need not
 

5The Eighth Circuit recently noted this "possible conflict."
Gaworski v. ITT Commercial Fin. Corp., 17 F.3d 1104, 1112 n.7 
(8th Cir.), cert. denied, 115 S. Ct. 355 (1994). 

6In addition to the cases catalogued above, several trial-
level cases in this circuit take the same position. See, e.g., 
Townsend v. Grey Line Bus Co., 597 F. Supp. 1287, 1293 (D. Mass. 
1984) ("The better view . . . is that the recovery of back pay
under Title VII is an equitable remedy intended primarily to make

13

decide that precise question today. Even if we assume, arguendo, 

that granting discretion to district courts to deduct collateral

benefits from back pay awards is problematic, front pay presents

an easier call. After all, the dispensation of front pay if

only because of its relatively speculative nature, see Wildman, 

771 F.2d at 616 is necessarily less mechanical than back pay,

and the amount of front pay if only because of its predictive

aspect is necessarily less certain than back pay, see Hukkanen, 

3 F.3d at 286. For these reasons, front pay is much more heavily

dependent than back pay upon the district court's exercise of its

informed discretion.7 Consequently, whether or not courts

possess the authority to tailor back pay awards to take

collateral benefits into account a question that we leave open

for the time being we are confident that they possess the

authority to tailor awards of front pay in that manner.

2. The Nature of Equity. Beyond the relevant case 2. The Nature of Equity. 

 

the victim of discrimination whole."), aff'd, 767 F.2d 11 (1st 
Cir. 1985); Thurber v. Jack Reilly's Inc., 521 F. Supp. 238, 242- 
43 (D. Mass. 1981) (exercising equitable discretion to deduct
unemployment benefits from the plaintiff's back pay award),
aff'd, 717 F.2d 633 (1st Cir. 1983), cert. denied, 466 U.S. 904 
(1984); see also Crosby v. New Eng. Tel. & Tel. Co., 624 F. Supp. 
487, 491 (D. Mass. 1985) (predicting in an ADEA case that the
First Circuit will likely allow district courts to exercise
discretion in tailoring back pay awards to account for collateral
benefits).

7To illustrate this point, we remind the reader that, while
front pay is fully within the district court's discretion, back
pay is a presumptive entitlement of a plaintiff who successfully
prosecutes an employment discrimination case. Compare, e.g., 
Wildman, 771 F.2d at 615 with Costa v. Markey, 706 F.2d 1, 6 (1st 
Cir. 1982), cert. dismissed, 461 U.S. 920 (1983), and cert. 
denied, 464 U.S. 1017 (1983). 

14

law, our decision is informed by the nature of equity itself. In

particular, the abstract imposition of a black-or-white rule

regarding the relevance of collateral benefits, even if otherwise

desirable, would simply not comport with the essential character

and function of equitable discretion. And, though modern civil

practice for the most part merges equity with law, equitable

discretion remains a salient part of our legal system. See Ralph 

A. Newman, Equity and Law: A Comparative Study 50-53 (1961); see 

also Roscoe Pound, Introduction to Newman, supra, at 10 

(suggesting heightened importance of principles of equitable

discretion "in applying legal precepts and remedies").

Historically, equity powers emerged in response to the

rigidity of the common law, especially the impersonal generality

of the remedies it afforded. See, e.g., Harold J. Berman, Law 

and Revolution: The Formation of the Western Legal Tradition 

518-19 (1983); Peter C. Hoffer, The Law's Conscience: Equitable 

Constitutionalism in America 8-16 (1990). As Lord Ellesmere put 

it: "The Cause why there is a Chancery is, for that Mens Actions

are so divers and infinite, That it is impossible to make any

general Law which may aptly meet with every particular Act, and

not fail in some Circumstances." Earl of Oxford's Case, 21 Eng. 

Rep. 485, 486 (1615). Hence, "[t]he Office of the Chancellor is

. . . to soften and mollify the Extremity of the Law . . . ."

Id. Because the hallmarks of equity have long been flexibility 

and particularity, the imposition of a rigid rule, pro or con,

concerning the interrelationship between collateral benefits and

15

front pay (an equitable remedy) would be incongruent with the

historic and essential conception of equity. In contrast, a rule

that confers latitude upon the district court to handle the

interface between collateral benefits and front pay differently

in different cases is fully consistent with this storied

heritage.

For these reasons, we conclude that the decision as to

whether to tailor a front pay award to take into account

collateral benefits is, and must be, within the equitable

discretion of the nisi prius court. 

On much the same basis, we do not believe that this

discretion is rigidly circumscribed by the source of the 

collateral benefits.8 We consider the source of a collateral

benefit to be informative, but not dispositive. That is to say,

because the district court's decision about whether it should or

should not tailor a front pay award to dovetail with certain

collateral benefits is discretionary, we think it follows that

 

8The parties attach great significance to the source of the
benefits. The Service argues that the collateral source rule is
peculiarly inappropriate here because both the front pay and the
collateral benefits emanate from the same source the federal
government. Lussier sees no such special relationship. He
advocates that we judge the parcel not by its wrapping, but,
rather, by its contents, and asseverates that the post office is
an independent entity distinct from other federal agencies, such
as the Veterans Administration. In his view, therefore, the
front pay and the collateral benefits do not derive from the same
source, and there is all the more reason to apply the collateral
source rule simpliciter. Since the district court's 
discretionary decision in this case is sustainable without regard
to the source of the benefits, we need not decide the precise
relationship between the post office and other parts of the
federal apparatus.

16

the defendant's status as the source (or not) of the collateral

benefit comprises, at the most, one factor of many within the

mailbag of discretionary considerations. Here, too, the nature

and function of equity jurisprudence guide our reasoning.

To be sure, equity is not blind to the reality of

events. The fact that the payer of damages and the dispenser of

a collateral benefit are one and the same, or that they are

linked in some economically meaningful sense, tends to make the

deployment of the collateral source rule less attractive. See 

Smith v. OPM, 778 F.2d 258, 263 (5th Cir. 1985) (suggesting that 

the collateral source rule may lack force "when the collateral

source is the defendant"), cert. denied, 476 U.S. 1105 (1986); 

Enterprise Ass'n Steamfitters, 542 F.2d at 591 (similar); Olivas 

v. United States, 506 F.2d 1158, 1163-64 (9th Cir. 1974) 

(similar); see also 2 Dobbs, supra, 8.6(2), at 491. It is 

nonetheless easy to imagine scenarios in which the totality of

equitable considerations favors the rule's strict invocation

regardless of any affinity between payer and dispenser. To

recognize a mechanical same-source exception to the rule would

deny district courts the discretion to weigh these other

considerations and, thus, would offend the logic of equity.

Accordingly, we decline the parties' invitations to view the

source of a collateral benefit, without more, as determinative of

whether the benefit should be taken into account in fashioning a

front pay award.

B. Application of the Law. B. Application of the Law. 

17

Having surveyed the legal landscape, we now turn to the

decision below. Though we review a district court's factual

findings in a bench trial only for clear error, see, e.g., Reilly 

v. United States, 863 F.2d 149, 163 (1st Cir. 1988); RCI 

Northeast Servs. Div. v. Boston Edison Co., 822 F.2d 199, 201-02 

(1st Cir. 1987), we review its ultimate decision to impose or

withhold equitable remedies for abuse of discretion. See, e.g., 

Shore, 42 F.3d at 377-78; Rosario-Torres v. Hernandez-Colon, 889 

F.2d 314, 323 (1st Cir. 1989) (en banc) (listing cases). In

general, the abuse of discretion framework is not appellant-

friendly. See Dopp v. Pritzker, 38 F.3d 1239, 1253 (1st Cir. 

1994) (predicting that most appeals from discretionary decisions

of the district courts will come to naught). If we are to find

an abuse of discretion, the appellant ordinarily must persuade us

that the lower court "committed `a meaningful error in

judgment.'" Rosario-Torres, 889 F.2d at 323 (quoting Anderson v. 

Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988)).9 
 

9At a more refined level, we have focused appellate review
on the following considerations:

In making discretionary judgments, a district
court abuses its discretion when a relevant
factor deserving of significant weight is
overlooked, or when an improper factor is
accorded significant weight, or when the
court considers the appropriate mix of
factors, but commits a palpable error of
judgment in calibrating the decisional
scales.

United States v. Roberts, 978 F.2d 17, 21 (1st Cir. 1992). 
Whether the district court's decision is viewed macroscopically
or microscopically, however, the appellate focus is fundamentally
the same.

18

In employment discrimination cases, the abuse-of-

discretion standard is necessarily informed by the statutory

purposes at stake. See, e.g., Albemarle Paper Co. v. Moody, 422 

U.S. 405, 417 (1975); Enterprise Ass'n Steamfitters, 542 F.2d at 

583 n.2. In mulling Title VII, the Court has distilled two

primary purposes from the statute: the need to create and

maintain a level, discrimination-free playing field and the need

to make victims of discrimination whole. See McKennon v. 

Nashville Banner Publ. Co., 115 S. Ct. 879, 884 (1995); Albemarle 

Paper, 422 U.S. at 417-18. Thus, front pay awards must be 

gauged, at least in part, against the twin goals of eradicating

discrimination and ameliorating the harm that it has caused. See 

Shore, 42 F.3d at 378; Thompson, 678 F.2d at 292. On this basis, 

then, investigating the soundness of any remedial award in a

Title VII case entails two inquiries: (1) Does the district

court's decision serve "to achieve equality of employment

opportunity and remove barriers that have operated in the past to

favor an identifiable group of . . . employees"? Griggs v. Duke 

Power Co., 401 U.S. 424, 429-30 (1971). (2) Does the district 

court's decision serve "to make persons whole for injuries

suffered on account of unlawful employment discrimination"?

Albemarle Paper, 422 U.S. at 418. 

When addressed to the district court's front pay award,

these queries yield no sign of discretion misused. Taking the

inquiries in reverse order, the fit between the district court's

action and the second of the two statutory objects compensation

19

cannot be gainsaid. The root purpose of the challenged offset

is to prevent overcompensation and, thus, the district court's

decision faithfully serves the goal of making the plaintiff

whole. No more is exigible in this respect. See, e.g., Wyoming 

Retirement Sys., 771 F.2d at 1431; Orzel, 697 F.2d at 756. 

The district court's decision is also sufficiently in

service to the first of the two statutory objects: deterrence.

While any consideration that holds down the amount of a monetary

judgment can be said to lessen the deterrent effect of that

judgment, we believe that the relevant inquiry is broader in its

scope. Deterrence is a function of degree, and nothing in the

Rehabilitation Act or in the case law commands that it be

maximized at all costs. This practical wisdom has particular

force where, as here, maximizing deterrence might well interfere

with the measured achievement of other statutory goals.10 Even

short of maximization, the statutory purpose can be fully

satisfied so long as deterrence is meaningfully achieved. Cf. 

Navarro-Ayala v. Nunez, 968 F.2d 1421, 1427 (1st Cir. 1992) 

(holding, in the context of Fed. R. Civ. P. 11, that a monetary
 

10We add that, as between the two primary statutory
purposes, the goal of compensation, and not deterrence, is likely
the more important in regard to front pay. After all, the basic
function of a front pay award is to make victims of
discrimination whole. See Wildman, 771 F.2d at 615; see also 
EEOC v. Prudential Fed. Sav. & Loan Ass'n, 763 F.2d 1166, 1173 
(10th Cir.) (explaining that front pay "assur[es] that the
aggrieved party is returned as nearly as possible to the economic
situation he would have enjoyed but for the defendant's illegal
conduct"), cert. denied, 474 U.S. 946 (1985). For that reason, 
an abuse of discretion ordinarily will not lie when the trial
court, in the process of making the plaintiff whole no more, no
less happens to produce a marginal diminution of deterrence.

20

sanction aimed at deterrence is most appropriate "when the amount

of the sanction falls within the minimum range reasonably

required [effectively] to deter the abusive behavior");

Graefenhain, 870 F.2d at 1213 & n.9 (noting, in calculating front 

pay, that a court's "own vision of `optimal deterrence'" is not a

sufficient basis "to engraft additional remedies on a statutory

scheme which is predominantly compensatory"); Enterprise Ass'n 

Steamfitters, 542 F.2d at 592 (finding "no compelling reason of 

deterrence" that would justify "providing the injured party with

double recovery for his lost employment"). Here, every

indication is that the district court's award of front pay,

handsome eventhough diminished,packs an adequatedeterrent effect.

We add a postscript: viewing a front pay award in

isolation for the purpose of measuring its contribution toward

the goals of an antidiscrimination statute is risky business. A

front pay award like any other single strand in a tapestry of

relief must be assessed as a part of the entire remedial fabric

that the trial court has fashioned in a particular case. See, 

e.g., Barbano v. Madison County, 922 F.2d 139, 146 (2d Cir. 1990) 

(holding that the district court acted within its discretion in

denying front pay entirely because other relief, including back

pay, prejudgment interest, and attorneys' fees, sufficed to make

the plaintiff whole). This holistic principle takes into account

the fact that the finding of liability, in addition to setting

the stage for relief and thereby furthering the goals of

compensation and deterrence, itself sends a valuable

21

informational signal. See, e.g., McKennon, 115 S. Ct. at 885 

(explaining that the goals of an employment discrimination

statute are advanced by a finding of discrimination because

"disclosure through litigation of incidents or practices which

violate national policies respecting nondiscrimination in the

work force is itself important").

We sum up by remarking the obvious: decisions within

the world of equity by their nature reflect judicial efforts to

balance competing centrifugal and centripetal forces. In this

instance, the district court struck an entirely reasonable

balance between the goals of fair compensation and adequate

deterrence. Mindful of the breadth of the district court's

discretion in such matters, we affirm its decision to award front

pay to the plaintiff, but to tailor the award to take into

account the collateral VA benefits that he received as a result

of his unlawful discharge.11

III. LATE-ARRIVING EVIDENCE III. LATE-ARRIVING EVIDENCE

In general, the view that we take of the flexible

interplay between front pay and the collateral source rule

 

11The Service complains that the lower court erred in
figuring the amount of VA benefits used to reduce Lussier's front
pay award. Because the factfinder's choice between two or more
permissible views of the evidence cannot be deemed clearly
erroneous, see Cumpiano v. Banco Santander P.R., 902 F.2d 148, 
152 (1st Cir. 1990), we reject this complaint (which, in any
event, is anchored in an overly optimistic reading of the record)
out of hand.

22

extends to CSRS benefits.12 Withal, the district court's

handling of these benefits gives us pause.

During the trial, reference was made to Lussier's

eligibility for a CSRS disability retirement annuity. The

government advanced a rough estimate of the monthly stipend that

Lussier would likely receive. Dissatisfied with the trial

evidence on this subject, the district court ordered "the parties

to file within 30 days a status report concerning Lussier's

application for CSRS disability benefits." Lussier I, 1994 WL 

129776, at *11. Lussier, though objecting vigorously to the

directive, submitted some information anent interim payments.

The Service offered no assistance. Eventually, the court reduced

its planned front pay award based on the new information. Both

parties appeal.

Lussier contends that the entire enterprise was

procedurally infirm; that the Service failed to prove the amount

of any purported offset, thus rendering the issue moot; and, in

all events, that the collateral source rule should have operated

to disqualify the CSRS benefits from consideration in connection

with the front pay award. For its part, the Service asseverates

that the court erred in not using the estimate of CSRS benefits

introduced at trial, or, alternatively, in not granting its Rule

59(e) motion and using the more precise figure limned therein.
 

12Lussier argues that CSRS benefits arise, at least in part,
out of employee contributions, and, therefore, should not be
treated in the same manner as other collateral benefits. We
express no opinion on this aspect of the matter. Lussier can, of
course, renew the argument before the district court on remand.

23

Since we give our stamp of approval to Lussier's first

contention, we need not address the parties' other points.

Typically, a district court's decision to reopen the

record for the purpose of receiving additional evidence engenders

an exercise of the court's discretion, reviewable for abuse of

that discretion. See Zenith Radio Corp. v. Hazeltine Research, 

Inc., 401 U.S. 321, 331-32 (1971); Briscoe v. Fred's Dollar 

Store, Inc., 24 F.3d 1026, 1028 (8th Cir. 1994); Natural 

Resources Defense Council, Inc. v. Texaco Ref. & Mktg., Inc., 2 

F.3d 493, 504 (3d Cir. 1993); Hartford Accident & Indem. Co. v. 

Gulf Ins. Co., 837 F.2d 767, 773 (7th Cir. 1988). This rule 

pertains even when the district court opts to reopen the record

on its own initiative. See, e.g., Calage v. University of Tenn., 

544 F.2d 297, 301-02 (6th Cir. 1976) (upholding district court's

sua sponte solicitation and consideration of post-trial 

evidentiary submissions in employment discrimination suit); see 

also Briscoe, 24 F.3d at 1028. Here, however, the district court 

despite what it said did not reopen the record; instead, the

court, over the plaintiff's objection, engaged in a unilateral

pursuit of additional evidence without affording the parties the

standard prophylaxis that generally obtains at trial.13 While

we do not doubt the court's good intentions the judge was

clearly motivated by concerns of judicial economy and a desire to

 

13These protections include, but are not limited to, the
right to object to evidence, the right to question its source,
relevance, and reliability, the right to cross-examine its
proponent, and the right to impeach or contradict it.

24

be fair to all parties it chose a mode of evidence-gathering

that offends accepted practice and contradicts existing law.

Therefore, we must sustain Lussier's preserved objection to it.

And, moreover, because the error affected substantial rights 

the court used the extra-record information anent interim

payments to reduce the amount of the front pay award the

judgment must be vacated. We explain briefly.

It is a fundamental principle of our jurisprudence that

a factfinder may not consider extra-record evidence concerning

disputed adjudicative facts. A good illustration of this precept

in operation can be found in the realm of judicial notice. Under

Fed. R. Evid. 201(b), a judge may take notice of an adjudicative

fact only if it is "not subject to reasonable dispute in that it

is either (1) generally known within the territorial jurisdiction

of the trial court or (2) capable of accurate and ready

determination by resort to sources whose accuracy cannot

reasonably be questioned." Courts have tended to apply Rule

201(b) stringently and well they might, for accepting disputed

evidence not tested in the crucible of trial is a sharp departure

from standard practice. Hence, in Cooperativa de Ahorro y 

Credito Aguada v. Kidder, Peabody & Co., 993 F.2d 269 (1st Cir. 

1993), petition for cert. filed (U.S. Oct. 12, 1993) (No. 93- 

564), we held that the district court exceeded the bounds of Rule

201(b) by gleaning information supposedly known "within

institutional investment circles" from financial periodicals that

were not offered into evidence. See id. at 272-73; see also Barr 

25

Rubber Prods. Co. v. Sun Rubber Co., 425 F.2d 1114, 1125-26 (2d 

Cir.) (stating similar legal tenets), cert. denied, 400 U.S. 878 

(1970).

In this case, the court's acquisition of extra-record

information by special delivery is similarly beyond the pale.

Its actions cannot be justified under the first furculum of Rule

201(b). Facts that are "generally known within the territorial

jurisdiction of the trial court" are those that exist in the

unrefreshed, unaided recollection of the populace at large. See 

21 Charles A. Wright & Kenneth W. Graham, Jr., Federal Practice 

and Procedure 5105, at 489 (1977). Though a court, under this 

rubric, may take judicial notice of such varied matters as the

"traditional features of a snowman," Eden Toys, Inc. v. Marshall 

Field & Co., 675 F.2d 498, 500 n.1 (2d Cir. 1982), or the 

popularity of certain reusable containers, Price Food Co. v. Good 

Foods, Inc., 400 F.2d 662, 665 (6th Cir. 1968), or the 

impossibility of driving from one place to another in a specified

period of time, United States v. Baborian, 528 F. Supp. 324, 332 

(D.R.I. 1981), it is pellucid that the facts surrounding the

interim CSRS payments the amount received, how the amount was

derived, its significance in relation to the likely size of

Lussier's disability retirement annuity, and the relevance (if

any) of the interim benefits to front pay never achieved the

requisite level of popular familiarity.

By like token, the evidence also fails to satisfy the

26

second branch of Rule 201(b). Court records aside,14 some

government documents are subject to judicial notice (albeit under

certain limited conditions) on the ground that information

contained therein is "capable of accurate and ready determination

by resort to sources whose accuracy cannot reasonably be

questioned." See, e.g., Massachusetts v. Westcott, 431 U.S. 322, 

323 n.2 (1977) (per curiam) (taking judicial notice of fishery

licenses as reflected in the records of the Coast Guard's

Merchant Vessel Documentation Division). The information here at

issue does not reach this safe harbor. In the first place, the

information is not contained in generally available government

records. Second, the court did not acquire it by direct resort

to any public record, but, rather, through untested unilateral 

submissions. Third, a monetary figure affecting a plaintiff's

ultimate award, even though eventually quantifiable, seems to us

to be the sort of disputed adjudicative fact for which the

adversarial truth-finding process is well suited. And, finally,

the court gave the parties no real opportunity to address or

counter the gleaned evidence.15
 

14Because courts may take judicial notice of their own
records and the records of sister tribunals under a special set
of rules, see generally 21 Wright & Graham, supra, 5106, at 
256-57 (Supp. 1994), we exempt court documents from this
discourse.

15Westcott forms an interesting contrast to this case. 
There, in addition to the qualitative differences in the
information sought and in the data source upon which the court
relied, "[t]he parties were given an opportunity to comment on
the propriety of [the Court's] taking notice of the license, and
both sides agreed that [the Court] could properly do so." 433
U.S. at 323 n.2. Neither of these conditions obtains here.

27

Ours is a system that seeks the discovery of truth by

means of a managed adversarial relationship between the parties.

If we were to allow judges to bypass this system, even in the

interest of furthering efficiency or promoting judicial economy,

we would subvert this ultimate purpose. As Rule 201(b) teaches,

judges may not defenestrate established evidentiary processes,

thereby rendering inoperative the standard mechanisms of proof

and scrutiny, if the evidence in question is at all vulnerable to

reasonable dispute.

Here, the district court failed to steer by this

beacon. There is no indication, despite the court's contrary

characterization,16 that the record was actually reopened or

that the parties were afforded anything approximating the

evidentiary and procedural guarantees to which they were

entitled. Similarly, there is no basis for finding that the

parties waived this deprivation, consented to the court's

shortcut, or otherwise invited judicial reliance on the extra-

record "proof." To the extent that the judgment is premised on

this late-arriving evidence, it cannot stand.

 

16The district court paid lip service to the principle we
have discussed, writing that it had "reopened the record." But
the parties agree that no actual reopening occurred, and calling
what the court did a "reopening" does not make it so. Cf. 
Siegfriedt v. Fair, 982 F.2d 14, 19 (1st Cir. 1992) ("With Juliet 
we ask `What's in a name?' and with her we conclude `[t]hat which
we call a rose by any other name would smell as sweet.'")
(quoting William Shakespeare, Romeo and Juliet act 2, sc. 2). 

28

Accordingly, we vacate the judgment and remand.17 We

neither dictate how the district court should proceed on remand

nor restrict its range of options. For instance, without

limiting the generality of the foregoing, the court may in its

discretion choose to reopen the record fully for the purpose of

obtaining more information about Lussier's CSRS benefits, and, if

the court follows that path, it can then decide what, if any, use

to make of the new evidence. Alternatively, the court may, if it

so elects, hold the parties to their proof at trial and determine

the front pay award on the existing record.

IV. CONCLUSION IV. CONCLUSION

We have reached the point at which neither snow, nor

rain, nor heat, nor gloom of night, nor any lingering unresolved

issue impedes the delivery of our judgment. Thus, we need go no

further.

We hold that the adjustment of a front pay award under

the Rehabilitation Act of 1973 to take collateral benefits into

account is within the equitable discretion of the district court;

and that, in this case, the court, by choosing to account for

collateral benefits in fashioning such an award, did not abuse
 

17We neither overlook nor condone the Service's cavalier
disregard of the district judge's request for status reports.
Had the judge scrapped the proposed offset as a sanction for
uncooperative behavior, a different issue would confront us. Cf. 
R.W. Int'l Corp. v. Welch Foods, Inc., 937 F.2d 11, 19-20 & n.9 
(1st Cir. 1991). Here, however, the judge did not purpose to
sanction the Service but instead decided a hotly disputed issue
in the case based partly on extra-record information. As we have
indicated on other occasions, even when a party is guilty of
"lollygagging that a district court should not have to tolerate,
two wrongs seldom make a right." Id. at 20. 

29

its discretion. But because the court, in calculating a

particular offset, relied on evidence dehors the record, we 

vacate the judgment and remand for further proceedings relating

to that offset.

Affirmed in part, vacated in part, and remanded. Each Affirmed in part, vacated in part, and remanded. Each 

party shall bear his own counsel fees and costs in regard to party shall bear his own counsel fees and costs in regard to 

these appeals. these appeals. 

30